# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| Puerto Rico Hospital Supply, Inc., <br>   Plaintiff <br>      v. <br><br> Boston Scientific Corp., <br>   Defendant. | Civil No. 05-1523 (HL) |

## ORDER

Before the Court is plaintiff Puerto Rico Hospital Supply, Inc.'s motion for a preliminary injunction to maintain the status quo of the parties' Distributorship Agreement pending arbitration before the International Chamber of Commerce.[1]  On June 9, 2005, a hearing on said motion was held before the undersigned.[2]  The parties filed simultaneous briefs on June 14, 2005.[3]

For the reasons set forth below, plaintiff's motion for a preliminary injunction is **DENIED**.

## BACKGROUND

Puerto Rico Hospital Supply, Inc. ("PRHS") is a corporation organized under the

---

[1] *See* docket no. 2.

[2] *See* docket no. 12.

[3] *See* docket nos. 17-19.

laws of the Commonwealth of Puerto Rico dedicated to the promotion, sale, and distribution of medical products and supplies to hospitals, clinics, and physicians in Puerto Rico. Boston Scientific Corporation ("BSC") is a Massachusetts-based company which produces, *inter alia*, the Medi-tech line of peripheral vascular medical products. In the Fall of 1988, PRHS' former vice-president of marketing and sales and current president, Felix Santos, attended a radiologist convention in Chicago where he met BSC management. At that time, BSC did not have any presence in the Puerto Rico market. Thereafter, Mr. Santos on the behalf of PRHS and Don Woods on the behalf of BSC negotiated a Distributorship Agreement.[4] The Distributorship Agreement was finalized and executed on July 10, 1989. Since said date, PRHS has been the exclusive distributor[5] of BSC's Medi-tech products in Puerto Rico. PRHS sells approximately 1.1 million dollars worth of BSC's Medi-tech products annually. PRHS' annual gross profit from the sale of these products is approximately $400,000.00 to $500,000.00.

The Distributorship Agreement contains both an arbitration clause and a choice of law provision.[6] Article 9.6(a) of the Agreement provides that "[t]his Agreement and all

---

[4] *See* Joint Ex. I.

[5] PRHS purchases the Medi-tech products from BSC; maintains an inventory of the products; maintains a warehouse for the products; assumes the risk of loss of the inventory after purchase; assumes the credit risk after purchase; promotes the product; closes sales; provides pricing; delivers the product; and provides financing for the purchase of the products to its clients.

[6] *See* Distributorship Agreement, Joint Ex. I, at ¶ 9.6(a),(b).

related business transactions shall be governed by the laws of the Commonwealth of Massachusetts and, to the extent applicable, the Commonwealth of Puerto Rico and the United States of America."[7]  Pursuant to Article 9.6(b) of the Agreement, "all disputes arising in connection with this Agreement or questions as to the construction hereof or as to the right or liabilities of any parties hereunder shall . . . be referred to and finally settled by arbitration held and conducted in accordance with the Rules of Conciliation and Procedure of the International Chamber of Commerce."[8]

Article 8.1. of the Distributorship Agreement provides that "[the] Agreement shall become effective as of July 10, 1989 (the "Effective Date"), and shall remain in full force and effect until June 30, 1991.  The term of this agreement of the parties for periods of one (1) year, provided such agreement is reached at least three months before the expiration of the original or extended term – as the case may be."[9]  Since 1989 there has never been any interruption in PRHS' distribution of BSC's Medi-tech products.  For the past fourteen (14) years,  the parties have renewed the Agreement without written notification of their intent to renew. The evidence is undisputed that each year the Distributorship Agreement was automatically renewed by the parties through the normal course of business.

On April 29, 2005, BSC provided PRHS with a letter that stated that pursuant to

---

[7] *Id* at ¶ 9.6(a).

[8] *Id* at ¶ 9.6(b).

[9] *See* Joint Ex. I, ¶ 8.1.

section 8.1 of the Distribution Agreement, the Agreement would not be renewed and thus, would terminate on June 30, 2005.[10] Said letter provides that the decision to terminate was based, among other things, on the fact that PRHS has breached sections 2.2 and 3.3 of the Agreement by failing: (1) "to use its best efforts to 'develop and promote the use and sale of, sell and deliver, and assure customer satisfaction for, the Products within the Territory;'" (2) "to maintain 'an adequate inventory and a suitable staff in the Territory for the proper promotion sale, delivery and servicing of the Products and for assuring customer satisfaction;'" (3) and "to timely pay the amounts owed for the Products purchased from BSC." (*See* Joint Ex. II, at 1-2).

On May 16, 2005, PRHS filed a request for arbitration before the International Chamber of Commerce ("ICC") Court of Arbitration.[11] In said petition, PRHS also requests damages and conservatory or interim measures pursuant to the Puerto Rico Dealer's Act, 10 L.P.R.A. § 278b-1 ("Law 75") and Article 23 of the ICC Rules of Arbitration. On that same date, PRHS filed a verified complaint before this Court seeking solely provisional and preliminary injunctive remedies pursuant to Puerto Rico's Law 75 and Article 23 of the ICC Rules of Arbitration to maintain the status quo of the parties' Distributorship Agreement pending arbitration before the International Chamber of Commerce.[12]  BSC subsequently

---

[10] *See* Joint Ex. II.

[11] *See* docket no. 2, Ex. I.

[12] *See* docket no. 1.

filed a motion to dismiss the verified complaint on the grounds that pursuant to the Federal Arbitration Act, 9 U.S.C. §2, this Court lacks the authority to entertain plaintiff's request for a preliminary injunction.

A show cause hearing on PRHS's motion for preliminary injunction was held on June 9, 2005.[13] Testimony on behalf of PRHS's president, Felix Santos, was heard. Counsel for BSC appeared for the hearing unprepared and did not present any evidence or witnesses. Mr. Santos testified that BSC's claims were without any basis or merit, and that the non-renewal or termination letter dated April 29, 2005, was the first complaint that PRHS had ever received from BSC. Mr. Santos further testified that PRHS has not been in arrears in payment to BSC and that he had personally verified the records and that all accounts had been paid on time. Five days after the hearing, BSC produced financial records and affidavits contradicting Mr. Santos' testimony. However, the Court will not consider this documentation because it was untimely filed after evidence was closed and was not accompanied by sufficient explanation for the delay.[14]

**DISCUSSION**

**I.**

---

[13] *See* docket no. 12.

[14] *See* docket no. 15. The Court takes a dim view of counsel coming to the show cause hearing unprepared, and then after the conclusion of the hearing, filing documents that were previously available to him and could have been used at the hearing, but were not.

The Court of Appeals for the First Circuit has held that "a district court can grant injunctive relief in a arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir.1986); *see also*, *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 151 (1st Cir.1998) (finding that a district court has "jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration")(citing *Teradyne, Inc.*, 797 F.2d at 51); *Danieli & C. Officine Meccaniche, S.p.A. v. Morgan Constr.*, 190 F.Supp.2d 148, 154 (D.Mass.2002) ("Notwithstanding the arbitrability of the parties' dispute, this Court has the authority to grant preliminary injunctive relief to preserve the status quo pending arbitration provided the prerequisites for injunctive relief are met.")). "[T]his approach reinforces rather than detracts from the policy of the Arbitration Act . . . [since] the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process." *Teradyne, Inc.*, 797 F.2d at 51 (internal citations omitted).

In the present case, the Court also sources authority to entertain movant's motion for preliminary injunctive relief from Article 23 of the ICC Rules of Arbitration. As discussed above, the arbitration clause of the Distribution Agreement provides that all disputes with the Agreement shall be referred to and finally settled by arbitration held and conducted in

accordance with the conciliation and procedural rules of the ICC.[15] Thus, the Rules of Arbitration of the ICC are incorporated into the parties' Distributorship Agreement. Article 23-2 of the ICC Rules of Arbitration provides that "[b]efore the file is transmitted to the Arbitral Tribunal, and in appropriate circumstance even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal." Art. 23-2 of ICC Rules of Arbitration. Therefore, the Court concludes that it has the authority to grant preliminary injunctive relief to preserve the status quo of the Distributorship Agreement pending arbitration provided that the prerequisites for injunctive relief are met. Accordingly, defendant BSC's motion to dismiss is **DENIED**.[16]

## II.

A party seeking preliminary injunctive relief has the burden to demonstrate (1) a significant risk of irreparable harm in the absence of injunctive relief; (2) that such harm outweighs any harm which granting injunctive relief would inflict on defendant; (3) a

---

[15] *See* Joint Ex. I, at ¶9.6 (b).

[16] *See* docket no. 9; *see also* Transcript, Order to Show Cause on Preliminary Injunction at 73-76, docket no. 19, Ex. I, 73-76.

likelihood of success on the merits; and (4) that the public interest will not be adversely affected by granting the injunction. *See TEC Engineering Corp. v. Budget Molders Supply Inc.,* 82 F.3d 542, 544 (1st Cir.1996).

"Irreparable harm is an essential prerequisite for a grant of injunctive relief." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir.2000); *see also Matos ex rel. Matos v. Clinton Sch*., 367 F.3d 68, 73 (1st Cir.2004) ("[I]rreparable harm is a necessary threshold showing for awarding preliminary injunctive relief."). The "burden of demonstrating that the denial of preliminary injunction is likely to cause irreparable harm rests squarely upon movant." *Charlesbank Equity Fund II v. Blinds to Go*, 370 F.3d 151, 162 (1st Cir.2004). In the present case, the Court finds that plaintiff PRHS has failed to satisfy this burden.

PRHS argues that if this Court does not issue a preliminary injunction it will suffer irreparable harm because (1) it will lose profits; (2) one of its employees will be detrimentally affected; and (3) its business reputation will be negatively impacted. "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction . . . or by a later-issued damages remedy." *Rio Grande Cmty Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir.2005). PRHS' claim of lost profits is not sufficient to justify preliminary injunctive relief for two reasons. First, the loss to PRHS is not substantial. PRHS sells approximately

54 million dollars worth of merchandise annually. BSC's Medi-tech products represent only 1.1. million dollars, or a mere two percent (2%) of the company's total sales. Second, the potential loss of profits to PRHS is calculable, and could easily be remedied by a subsequent award of damages. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 13 (quoting *K-Mart Corp v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir.1989)) ("The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.") Therefore, PRHS' lost sales are insufficient to show irreparable harm because PRHS could be compensated for such loss by a monetary damages award. *See Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.*, 378 F.3d 29, 34 (1st Cir.2004).

We turn now to PRHS' second claim, that it will suffer damage to its reputation if a preliminary injunction is not granted. It is decidedly more difficult to determine whether money damages are ascertainable, and thus a sufficient remedy, with regard to injury to business reputation. *See Matrix Group Ltd., Inc.,* 378 F.3d at 24. However, in the present case, we find PRHS' particular claim of reputational harm to be too speculative and unsubstantiated to constitute irreparable injury. PRHS claims that absent the preliminary injunction, the physicians who depend on BSC Medi-tech products will no longer be able to obtain these products in Puerto Rico, and thus PRHS's business reputation will be irretrievably destroyed.

The Court is not persuaded by this argument. It is undisputed evidence that these physicians will continue to have access to BSC's Medi-tech products because BSC will

promptly assume service to PRHS's current Medi-tech clients. Moreover, PRHS testified that the potential market for Medi-tech products is comprised solely of fourteen (14) physicians because only interventional radiologists use Medi-tech products and there are only fourteen interventional radiologists in Puerto Rico. Therefore, we conclude that it is highly improbable that the business reputation of PRHS – a company that has been in business in Puerto Rico for fifty-eight (58) years, has $54 million in revenue per year, and sells multiple product lines – will be harmed when approximately fourteen[17] physicians begin receiving Medi-tech products directly from the manufacturer, rather than from PRHS. Any harm that PRHS is likely to suffer from the termination of the Dealership Agreement appears to be purely financial in nature, and thus, is best remedied through monetary damages.

PRHS' final argument is that at least one employee will be substantially and negatively affected if injunctive relief is not afforded. PRHS' president, Felix Santos, testified that PRHS has over two hundred (200) employees and that only one employee, who devotes 90% of his work to the Medi-tech line, would be affected by the termination of the Distributorship Agreement. PRHS did not provide any specifics about how this employee would be detrimentally affected or why this employee could not simply be redistributed to work with PRHS' other product lines. The Court finds that PRHS'

---

[17] This number may be smaller since this figure represents the approximate total market for Medi-tech products, not the number of Medi-tech clients that PRHS currently serves.

amorphous claim that one of the company's two hundred employees will be detrimentally impacted simply does not constitute irreparable injury.

As PRHS has failed to establish a threshold showing of irreparable harm, the Court's inquiry stops here. However, it is important to note that a petition for conservatory and interim relief is squarely before the ICC Arbitral Tribunal, which is better suited to determine whether such relief is warranted. The Distribution Agreement in this case contains an ambiguous choice of law provision. "Where an agreement contains a valid arbitration clause as well as a choice of law provision [such as in the case at hand], the determination of what law applies should be made by the arbitrator." *See Danieli & C. Officine Meccaniche S.p.A.*, 190 F.Supp.2d at 156 (citing *Medika Int'l., Inc. v. Scanlan Int'l, Inc.*, 830 F.Supp. 81, 87 (D.P.R. 1993); *Misubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n. 19 (1985); *Protane Gas Co. of Puerto Rico, Inc. v. Sony Consumer Products Co.*, 613 F.Supp. 215 (D.P.R. 1985) ("The controversy concerning the law to be applied is one falling within the scope of the agreement. Accordingly, such consideration is for the arbitrators and not for the courts.")).

Thus, the ICC Arbitral Tribunal will be able to determine what law should be applied to the controversy between the parties. Specifically, the Arbitral Tribunal can ascertain the applicability of Puerto Rico's Law 75's provisional remedy, 10 L.P.R.A. § 278b-1, which requires a less stringent showing of injury than the traditional preliminary injunction standard announced by the First Circuit. *See De Moss v. Kelly*, 493 F.2d 1012, 1015 (1st

Cir.1974) ("The availability of temporary relief under [Law 75] is not tied to a showing of irreparable injury or to probability of success in the case on the merits, but rather to the policies of the Act in promoting the continuation of dealership agreements and the strict adherence to the provisions of such agreements.").

## CONCLUSION

For the aforementioned reasons, defendant BSC's motion to dismiss the verified complaint is **DENIED,** and plaintiff PRHS' motion for preliminary injunction is **DENIED**. Finally, pursuant to the Federal Arbitration Act and the arbitration provision of the parties' Distributorship Agreement, the Court hereby orders arbitration before the International Chamber of Commerce. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 17, 2005.

S/ HECTOR M. LAFFITTE<br>United States District Judge